AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of Maine

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 2:16 · MJ · 134 · JHR |
| Garrett G. Brosnan | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____June 2, 2016; and June 7, 2016____ in the county of ____Sagadahoc____ in the

_____ District of ____Maine____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Counts One and Two 18 U.S.C. § 1470 | On about June 2, 2016 (Count One), and June 7, 2016 (Count Two), in the District of Maine, the defendant used the internet, a facility and means of interstate commerce, to knowingly attempt to transfer obscene matter to another individual who the defendant believed to be under the age of 16 years, that is, a 14-year-old female, knowing that such other individual had not attained the age of 16 years. |

This criminal complaint is based on these facts:

See Affidavit of Special Agent Douglas M. McDonnell, attached

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Douglas M. McDonnell, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____06/20/2016____

_____
*Judge's signature*

City and state: ____Portland, Maine____

John H. Rich III, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANT, AND SEARCH WARRANT

I, Douglas M. McDonnell, being first duly sworn, hereby state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of applications for the following:

      a.      A criminal complaint and arrest warrant charging Garrett G. Brosnan with attempted transfer of obscene material to a minor, in violation of Title 18, United States Code, Section 1470; and

      b.      A search warrant for the premises located at 90 Dummer Street, Bath, Maine, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B. This application seeks authority for a warrant to search for and seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1470.

2.      I am a Special Agent (SA) with Homeland Security Investigations (HSI), and have been since May 2003. I am currently assigned to HSI's Portland, Maine office. I have participated in numerous criminal investigations, to include matters involving the sexual exploitation of children. In my career I have utilized various investigative tools and techniques, to include the use of search warrants.

### PROBABLE CAUSE

#### Complaint in Flagstaff, Arizona

3.      On May 9, 2016, the HSI office in Flagstaff, Arizona was contacted by the Flagstaff Police Department (FPD) regarding an incident that occurred in October 2015, in which a 13-year-old girl had a five-day online conversation with an individual with a user name of GREEKGUNS. The online conversation appeared to have started on October 11, 2015, and ended on October 17, 2015. The online conversation occurred on a website identified as

QUIZTRON. The minor female's parents found the conversation on a device used by the family, subsequently made copies of the online conservation, and provided it the FPD. On May 9, 2016, the FPD provided HSI Flagstaff SA Chris Foster with the case material regarding the above incident.

4.      On January 15, 2016, the father of the 13-year-old girl went to the FPD and made a report regarding his daughter being engaged in an online conversation with a male who identified himself as a 19-year-old male. The father was concerned as the conversation became sexual in nature. The victim's father then provided Officer Blair with screenshots of the conversation on QUIZTRON.

### Initial Follow-up Investigation in Arizona

5.      During the online conversation, GREEKGUNS provided an email address of twogunns20@yahoo.com and requested pictures of the minor female. Based on this information, the FPD issued a subpoena to Yahoo!. On March 22, 2016, the FPD received a subpoena return from Yahoo! regarding the email address twogunns20@yahoo.com. The Yahoo! account was originally registered on October 2, 2011, from internet protocol (IP) address 192.149.109.63. The FPD learned the IP address is assigned to Norwich University in Northfield, Vermont. Yahoo! provided an additional recovery email address of neckogreek@gmail.com. Yahoo! provided the registration name of GARRETT B with a zip code of 04011. The zip code 04011 is for the town of Brunswick, Maine. The Yahoo! account was deactivated on February 10, 2016. Additionally, Yahoo! provided 27 login IP addresses for twogunns20@yahoo.com from July 28, 2015, through February 10, 2016.

6.      The FPD subsequently contacted Norwich University and provided the name and zip code from the Yahoo! response in an attempt to identify the user. Norwich University

2

informed the FPD that only one person, Garrett G. Brosnan, was enrolled at the university in the fall of 2011 and matched the provided information.

7.     On May 2, 2016, the FPD received a subpoena return from AT&T regarding the 27 IP addresses referenced above and provided by Yahoo! which were used to access twogunns20@yahoo.com. AT&T indicated that the above 27 IP addresses were used by AT&T Wireless for internet access and web-based applications for wireless devices.

8.     On May 4, 2016, the FPD received a subpoena return from Google regarding the email address neckogreek@gmail.com. In the Google response, twogunns20@yahoo.com was listed as the recovery email for that account. Google listed 192.149.109.63 as the initial registration IP address for neckogreek@gmail.com, which was the same registration IP as twogunns20@yahoo.com. Google also listed a short message service (SMS) phone number associated with the email account as (207) 841-9782.

9.     On May 9, 2016, SA Foster accessed Facebook and located a user with the name Garrett Brosnan who appeared to reside in Topsham, Maine, and was from Brunswick, Maine. SA Foster observed several pictures of Brosnan in what appeared to be a Brunswick police officer uniform. SA Foster also observed a picture showing Brosnan holding up a badge in a family picture.

10.     Also on May 9, 2016, SA Foster created an undercover online account on YOUTHINK.com, the owner of the QUIZTRON website. SA Foster created a username of "splitin2." SA Foster then located a user on the website with a username of GREEKGUNS. SA Foster observed on the GREEKGUNS profile that the user identified himself as male between the ages of 18 and 29 and had been a member of YOUTHINK.com since November 28, 2011. SA Foster reviewed the profile picture for GREEKGUNS and it appeared to be the same

3

individual depicted in photos on the Garrett Brosnan Facebook page. SA Foster then sent a

private message to GREEKGUNS stating "U look fun wats ur story."

### Additional Investigation by HSI in Arizona and Maine

11.     On May 10, 2016, SA Foster contacted HSI Portland, Maine SA Martin Conley as

Brosnan appeared to reside in the HSI Portland area of responsibility. SA Conley subsequently

requested my assistance with the investigation. SA Conley began to assist in the investigation to

include continuation of an undercover (UC) conversation through YOUTHINK. During the

online conversation with SA Conley, posing in a UC capacity as a minor female, GREEKGUNS

asked for Conley's age to which Conley replied, 13. GREEKGUNS then offered that he was 19.

GREEKGUNS then asked for a picture.

12.     On May 13, 2016, I conducted a query through the State of Maine Department of

Motor Vehicles for driver's license information on Garrett Brosnan. The response I received

showed that Garrett G. Brosnan listed an address of 90 Dummer Street in Bath. Also attached to

the response was Brosnan's driver's license photo. I viewed Brosnan's Facebook page and

observed that the photo from the driver's license response matched several photos of Brosnan on

his Facebook page.

13.     On May 17, 2016, SA Conley, acting in undercover capacity, logged

ontoYOUTHINK.com utilizing the user name splitin2 and sent a picture depicting what appeared

to be a head shot of a teenage female. GREEKGUNS asked SA Conley if he had a Kik account.

Kik, as described in the company's law enforcement guide, "is a smartphone messenger

application that lets users connect with their friends and the world around them through chat.

Users can send text, pictures, videos and more – all with the app." GREEKGUNS provided his

Kik username as IRISHBOMBER and asked for SA Conley to contact him on Kik. SA Conley

4

contacted IRISHBOMBER on Kik during the course of the conversation, and received a picture
from IRISHBOMBER. The picture depicted an individual similar in appearance to Brosnan's
driver's license and Facebook photos. Brosnan appeared to be lying on a bed with the picture
taken from above.

14.     On May 17, 2016, HSI Flagstaff submitted a Department of Homeland Security
Summons to Kik Interactive. On May 19, 2016, Kik Interactive responded to the summons. The
response included the following information:

**Kik Username:**     IRISHBOMBER

**First name:**     Garret

**Last name:**     smith

**Email:**     twogunns20@yahoo.com

IRISHBOMBER had a registration time stamp of September 8, 2012. On January 11, 2016,
IRISHBOMBER appeared to have registered a Samsung Galaxy S5 cell phone, model # SM-
G900A.

15.     Between April 19, 2016, 19:47:22 UTC, and May 19, 2016, 12:57:02 UTC, Kik
Interactive showed approximately 325 connections within the 30-day requested subpoena cycle.
During that period, approximately 15 unique IP addresses were identified.

16.     On May 20, 2016, HSI Flagstaff used an online IP search tool and learned the 15
unique IP addresses identified by Kik interactive were assigned to AT&T Mobility. On May 18,
2016, HSI Flagstaff submitted a Department of Homeland Security Summons to AT&T
Mobility. Information provided in response to the summons showed that Garrett G. Brosnan had
an account with AT&T Mobility for telephone number (207) 841-9782, the same number

5

associated with the email address neckogreek@gmail.com, as noted in Paragraph 8 above. The same information showed a user address for Brosnan of 20 Tarratine Drive in Brunswick, Maine.

17.     On May 18, 2016, SA Foster conducted an online open source search through the CLEAR database for Garrett Brosnan and learned Brosnan had a current address listed as 90 Dummer Street, Bath, Maine, 04530.

18.     On May 25, 2016, I queried the public website for the Brunswick Police Department. Under the Patrol Division roster listing, I observed an entry for an Officer Garrett Brosnan.

### Undercover Online Conversations with "IRISHBOMBER"

19.     Also on May 25, 2016, SA Foster contacted HSI SA Kathryn Gamble, who agreed to assist in the investigation in a UC capacity. SA Gamble, who was in Arizona, initiated a UC conversation with the Kik user IRISHBOMBER, Brosnan's suspected Kik identity. SA Gamble corresponded with Brosnan as IRISHBOMBER between May 25, 2016, and June 9, 2016.

20.     SA Gamble observed that the Kik identity IRISHBOMBER had the name Garret Smith attached to it. Additionally, a self-taken picture of an individual believed to be Brosnan appeared next to each message that he posted. The self-taken picture depicted Brosnan wearing a black t-shirt while holding what appeared to be a cellular phone near his face.

21.     During the conversation, SA Gamble indicated that she was a 14-year-old female from Arizona. Brosnan stated that his name was Garret and he was from New Hampshire. He further indicated that he was 22 years old and drove a Jeep. He claimed that he was a landscaper and also worked hospital security.

6

22.     During the course of the conversation, Brosnan repeatedly asked SA Gamble for pictures and the conversation became sexual in nature. The conversation progressed to the point where Brosnan asked for a picture of SA Gamble without a bra on. Brosnan stated on one occasion that he would like to make SA Gamble pregnant.

23.     On June 2, 2016, during the course of a conversation on Kik, Brosnan sent SA Gamble a picture depicting a male exposing his penis and stomach area. The picture appeared to have been taken in a bathroom with what appeared to be white walls, a bathroom mirror and a towel rack in background. A copy of the picture is submitted under seal as Attachment C. A short time later, Brosnan sent a picture depicting a male exposing his erect penis in his right hand. The subject was wearing a black shirt. The picture depicted the subject while lying down on a greyish color couch. A copy of the picture is submitted under seal as Attachment D.

24.     On June 7, 2016, Brosnan posted a series of videos of himself on Kik. All of the videos depicted Brosnan sitting in what appeared to be a living room on either a chair or a couch. In the background, a bookshelf was visible and the wall appeared to be cream-colored. In all of the videos, Brosnan was wearing a white t-shirt and a necklace with a sliver cross. All of the videos were approximately three seconds long, and appeared to have been taken by Brosnan. I have viewed the videos and pictures and offer the following descriptions:

a.     The first video depicted Brosnan winking and blowing a kiss.

b.     The second video depicted Brosnan winking. He also said something that was inaudible.

c.     The third video depicted Brosnan winking and blowing a kiss. He also said, "Let me see you love."

7

      d.     The fourth video depicted Brosnan winking and blowing a kiss. Brosnan also appeared to say, "Come on baby, you have seen me, let's go, let me see."

25.     Brosnan also posted a still image on June 7. The image showed him from the chest down, with his erect penis in his left hand. As in the four videos, he was wearing a white t-shirt with a necklace with a silver cross. A copy of the picture is submitted under seal as Attachment E.

### Additional Corroborating Investigation

26.     On June 10, 2016, I conducted surveillance of the address listed on Brosnan's driver's license. I observed, parked in the driveway of 90 Dummer Street, Bath, Maine, a white Jeep bearing Maine registration plate 4425TV. I conducted a query of the State of Maine Department of Motor vehicles and learned that the registration plate 4425TV is assigned to a 2007 white Jeep Liberty registered to Brosnan at the 90 Dummer Street address.

27.     In response to a subpoena issued to Facebook by HSI Flagstaff, I observed the following information provided by the company:

| | |
|---|---|
| **USER NAME:** | Garrett Brosnan |
| **EMAILS:** | navbrtt@yahoo.com |
| | garrett.brosnan@facebook.com |
| | gbrosnan@student.norwich.edu |
| | garrett.brosnan@gmail.com |
| **LOGINS IP ADDRESS:** | 72.65.125.110 |
| **TIME:** | 2016-04-20 03:19:51 UTC |
| **PHONE NUMBER:** | 207-841-9782. Cell verified on 09-26-2008 |
| **ACCOUNT ACTIVE:** | Yes |

28.    On June 12, 2016, SA Foster used an online IP search and learned that IP address 72.65.125.110 belongs to Fairpoint Communications. Fairpoint Communications provides residential and business communication services in Maine.

29.    On June 10, 2016, SA Foster requested mail and address information on 90 Dummer Street, Bath, Maine, 04530, from the United States Postal Service (USPS). On June 13, 2016, the USPS told SA Foster that on June 11, 2016, the USPS delivered mail from Fairpoint Communications to Garrett Brosnan at that address. Additionally, the USPS told SA Foster that in addition to the white Jeep described in Paragraph 26 above, a blueish Hyundai Elantra bearing Maine registration plate 4481UV was parked in the driveway. SA Foster conducted a DMV records check and learned that 4481UV was a blue, 2016 model year, Hyundai Elantra currently registered to Shannon Hughes at 18 Retriever Run, Topsham, Maine.

30.    On June 13, 2016, SA Foster accessed the Facebook page for Brosnan and located an individual by the name of Shannon Hughes who appeared to be Brosnan's girlfriend. SA Foster visited Shannon Hughes's Facebook page and observed several pictures of Hughes with Brosnan.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31.    As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

32.     *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

10

33.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection

11

programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a

12

"wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

        c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

        d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

        34.     Based on my training and experience I know that much of the media referenced above, which may contain contraband, fruits and evidence of crime, is by its very nature portable, this includes as example but is not limited to extremely compact storage devices such as thumb drives, laptop computers, and smart phones. In my training and experience, I know it is not uncommon for individuals to keep such media in multiple locations within their premises, including in outbuildings and motor vehicles.

13

35.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.      **The time required for an examination.** As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      **Technical requirements.** Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the

14

system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        c.      **Variety of forms of electronic media.**  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

      36.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

Based on the above facts, I submit that probable cause exists to believe that on June 2, 2016, and June 7, 2016, Garrett G. Brosnan knowingly attempted to transfer obscene material to an individual under the age of 16 using a facility or means of interstate commerce, in violation of 18 U.S.C. § 1470. I therefore request that the Court issue a criminal complaint and arrest warrant charging him with this offense.

I further submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Dated at Portland, Maine this 20th day of June, 2016.

Douglas M. McDonnell
Special Agent
Homeland Security Investigations

Sworn and subscribed before me this 20th day of June, 2016.

John H. Rich III
United States Magistrate Judge

16

## ATTACHMENT A

90 Dummer Street, Bath, Maine, is a single-story gray residence with white shutters. The residence has a front entrance off of a walkway and an additional side entrance off the driveway. The front of the residence is enclosed in a white fence and tall bushes.

The following is a photograph of the front of the residence:



## ATTACHMENT B

1.      All records relating to violations of Title 18, United States Code, Section 1470 committed by Garrett G. Brosnan in any form wherever they may be stored or found at 90 Dummer Street, Bath, Maine, including:

    a.  obscene matter sent or intended to be sent to minors;

    b.  records or information pertaining to a sexual interest in minors;

    c.  records or information pertaining to online chats or other conversations with minors;

    d.  records or information pertaining to the transfer or attempted transfer of obscene matter to minors;

    e.  records or information pertaining to the Kik username IRISHBOMBER;

    f.  records or information pertaining to the username GREEKGUNS;

    g.  records or information pertaining to the name "Garret Smith";

    h.  records or information pertaining to the email address twogunns20@yahoo.com;

    i.  records or information relating to the occupancy or ownership of 90 Dummer Street, Bath, Maine, including, but not limited to, utility and telephone bills, mail envelopes, and correspondence.

2.      Any computers or electronic media that were or may have been used as a means to commit the transfer or attempted transfer of obscene matter in violation of Title 18, United States Code, Section 1470.

3.      For any computer, computer hard drive, cellular telephone or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.  evidence of the times the COMPUTER was used;

g.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.  contextual information necessary to understand the evidence described in this attachment.

4.  Records and things evidencing the use of the Internet, including:

a.  routers, modems, and network equipment used to connect computers to the Internet;

b.  records of Internet Protocol addresses used;

c.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks, SD cards or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).